UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

                                             :          07 Cr. 1214  (RPPT)

  - against -                                :

PETER LIU

                                             :

      Defendant                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**<u>SENTENCING MEMORANDUM</u>**

Peter Enrique Quijano,  Esquire
QUIJANO & ENNIS, P.C.
381 Park Avenue South, Suite 701
New York, New York 10016
(212) 686-0666 (phone)
(212) 686-8690 (fax)
peter@qandelaw.com

Attorneys for Peter Liu

***QUIJANO & ENNIS***
ATTORNEYS AT LAW
381 PARK AVENUE SOUTH
SUITE 701
NEW YORK, NEW YORK  10016

TELEPHONE: (212) 686-0666
FAX: (212) 686-8690

Peter Enrique  Quijano
Nancy Lee  Ennis

July 8, 2008

**BY *ECF* and U.S. MAIL**

Honorable Robert P. Patterson
United States District Judge
United States District Court
for the Southern District of New York
500 Pearl Street
New York, New York   10007

**Re: U.S. v. Peter Liu, 07 Cr. 1214 (RPP)**

Dear Judge Patterson:

On behalf of my client, Peter Liu, I respectfully submit this letter pursuant to Fed. R. Crim. P. 32, in order to advise your Honor of several matters that the defense will raise at the time of his sentencing, to aid in the determination of the appropriate sentence.   On April 15, 2008,  Mr. Liu entered a plea of guilty to Count One of the above-referenced Information, participating in a conspiracy to defraud the U.S. Customs agency and the U.S. Postal Service by exporting, receiving and sending merchandise in violation of 18 U.S.C. §§ 371, 554; and Counts Two, Three, Four and Five, falsely representing the contents and dollar value on Customs declaration forms, in violation of 18 U.S.C. §554 and 39 C.F.R. Part 20. Mr. Liu's  sentencing is scheduled to take place before this Court on Thursday, July 17, at 4:00 p.m.

**A  REASONABLE SENTENCE**

The Supreme Court in U.S.  v. Booker, 543 U.S.220, 125 S. Ct. 738 (2005), held that the United States Sentencing Guidelines are not mandatory and should

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page two


not be applied to the exclusion of other important factors in determining the appropriate sentence. Accordingly, a sentencing court is now able to give due consideration to
all of the factors set forth in 18 U.S.C. § 3553 in order to fashion a sentence that is "sufficient, but not greater than necessary" to accomplish sentencing goals. "Now, post-Booker, the Guidelines are merely advisory, and a sentencing court must consider the Sentencing Commission's intent as just one of several salient factors, see 18 U.S.C. § 3553(a)(5)(A), in determining whether to impose a Guideline sentence or a non-Guideline sentence and the length of such sentence." United States v. Serrano, 2005 WL 1214314 at 6 (S.D.N.Y. May 19, 2005).

Noting that the Guideline range is one factor among many to consider in fashioning the appropriate sentence, the Supreme Court has directed that the sentencing court should commence by making an accurate computation:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. [ ] As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable.

Gall v. United States, 128 S.Ct. 586, 596-7 (2007), citing Rita v.United States, 551 U.S. ----, 127 S.Ct. 2456, 2465 (2007).

## I.  Computation pursuant to the United States Sentencing Guidelines

_____In order to arrive at the correct Guidelines calculation, it is necessary to consider not only the numerical designation accorded to each level, but also any

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page three


other factor which would have affected the outcome of the sentence when the
Guidelines were deemed mandatory. Here, at the time of the plea entry, the parties
recognized that the correct Guidelines range may arguably include a substantial
downward departure warranted by pre-Booker decisions. For this reason, in the
section titled 'Sentencing Range,' (Plea Agreement, p. 2, Sec. C), the plea agreement
specifically states that "[t]he defendant reserves the right to move for a downward
departure, pursuant to U.S.S.G. § 5K2.0. based solely on the argument that his
understanding of the offense conduct was such that his case falls outside the heartland
of the conduct covered by U.S.S.G. § 2M5.2. It is therefore respectfully submitted
that, in this instance, the correct Guidelines calculation can be reached only by
evaluating the computations contained in the PSR, together with the factors which
would warrant a downward departure under a Guidelines analysis.

### *A.  The Pre-Sentence Report (PSR):*

In the Presentence Report (hereinafter "PSR"), the Probation Department
adopted the stipulated sentencing Guidelines range set forth in the plea agreement.
Thus, if Mr. Liu's sentence were to be determined solely by quantifying the numerical
values assigned to each guideline level, the computation would be as follows:

¶29:   The defendant's Base Offense Level is 26, pursuant to U.S.S.G. § 2M5.2(a).

¶32:   A two-level reduction is warranted because Peter Liu was a minor participant,
       pursuant to U.S.S.G. §3B1.2(b).

¶35:   Mr. Liu is entitled to a 3-level reduction for Acceptance of Responsibility.

¶38:   Mr. Liu's Total Offense Level is 21.

¶41:   His Criminal History Category is I.

¶78:   Based upon a Criminal History Category of  I, and before calculation of any
       downward departure, the advisory Guidelines range is 37-46 months.


**Objections** to the PSR appear as an appendix to this submission as Exhibit A.

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page four

### B.  A downward departure is warranted because Peter Liu's conduct was significantly outside the heartland of that covered by §2M.5.2.

U.S.S.G. §5K2.0 provides that the sentencing court may depart from the applicable guideline range if there exists a mitigating circumstance "of a kind, or a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that, in order to advance  the objectives set forth in 18 U.S.C. §3553(a)(2), should result in a sentence different from that described." (U.S.S.G. §5K2.0(a)(1)).  Specifically, §5K2.0(3) provides the sentencing court with the power to depart below the advisory Guidelines range in the "exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree . . . substantially below that which ordinarily is involved in that kind of offense."

In U.S. v. Koon, the Supreme Court explained how a district court should decide whether to depart from the range prescribed in the particular Guideline (518 U.S. at 93 - 94, 116 S.Ct. 2035). First, it should identify what features of the case make it uncharacteristic or unusual, *id*. at 95; in other words, the court should first ask whether there are aspects of the case that potentially take it outside the Guideline's "heartland".  Next, the court may depart on an encouraged ground as long as the encouraged ground is not already taken into account by the particular offense guideline. *Id.* at 96.  If a factor is discouraged, or encouraged but already taken into account, the district court may depart only if such a factor is "present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present."  *Id.*  If the Guidelines do not mention the factor at all, a district court must consider whether this particular factor warrants departure. *Id.*

In determining whether a defendant's conduct is outside of the set of typical cases which §2M5.2 was intended to punish – that is, the universe of cases known as the "heartland" – a court must base its determination on the nature of the defendant's conduct in comparison with the conduct of others who have violated the same statute. Here, the "heartland" is that combination of motivation, knowledge and conduct

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page five

which usually lies at the core of the offense of exporting munitions list items without having the necessary licenses, and misrepresenting the customs labels during the exportation of the munitions list items. (*See*, U.S. v. Parish, 308 F.3d 1025 (9th Cir. 2002).

Simply put, when Peter Liu's conduct, comprehension and motivation are considered and measured against the type of conduct and motivation that §2M5.2 was designed to punish, it is becomes apparent that this is that rare and exceptional case which falls outside the heartland of the applicable guideline.

### (1)  Peter Liu's conduct in this case:

In the fall of 2005, Peter Liu, a veteran eBay user, decided that he could combine his experience with eBay and his skill using computers in order to supplement his income modestly, while providing a service to his former countrymen in Taiwan who wished to shop on U.S. eBay but were precluded by an eBay policy requiring bidder/purchasers to be U.S. residents.  Accordingly, Peter  posted an announcement on an eBay message board for Taiwanese, offering his services to translate and bid on items listed on U.S. eBay.  In essence, Peter offered to 'rent' his eBay account to his clients.  If a 'client' in Taiwan  saw an item he wished to buy, he would bid on the item using Peter's eBay account number.  Since Peter's account was linked to his e-mail, Peter was aware of the client's bid and the subsequent transaction.  If the client's bid was accepted and he purchased the item, the item was shipped to Peter, who would thereupon forward the item to his  client.  Peter's commission would be either five dollars ($5.00) or 10% of the purchase price, whichever was more.  Altogether, from late 2005 until the fall of 2007, Peter estimates that he had a total of seven (7) clients.  One of those clients, regrettably, was a man who called himself "Alex," but turned out to be an individual named Yen-Po Peng.  In total, Peter estimates that he earned a total of approximately seven thousand dollars ($7,000.00), of which approximately five to six thousand dollars ($5 – $6,000.00) may be attributable to Alex's purchases.

While Peter's other clients generally purchased items such as stereo equipment, sporting goods and clothing, Alex began purchasing what appeared to be expensive

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page six

high-tech hardware.  Peter did not meet Alex (and has never met him to this day);
theirs was a "virtual" relationship built entirely upon e-mails, instant messages and
phone calls.  Alex held himself out as a collector.  Indeed, it was not until reviewing
the PSR that Peter learned that Alex  worked for a business involved in reverse-
engineering technology, including military technology (PSR ¶9).

Alex would order expensive items which physically resembled binoculars or
elaborate batteries. While Peter generally recognized that binoculars and batteries do
not normally cost thousands of dollars, he permitted himself to believe that items
purchased on eBay must be benign.  Indeed, throughout his involvement in the
conspiracy, Peter never knew that the there was something called a Munitions List,
or that items that Alex was ordering were on the Munitions List.[1]

Once Peter would receive delivery of an item purchased by Alex, Alex would
have Peter inspect it, and then instruct him regarding how to prepare the customs
labels and forms for shipment to Taiwan.  Alex told Peter that by falsely understating
the value of the item, they would save on the tax.  In addition, Alex instructed Peter
to describe the contents in a benign fashion, such as describing them as 'toys,' in
order to avoid interference and inspections by custom officials.  Of course, from the
beginning Peter understood that he must be violating the law by falsely understating
the cost, and falsely describing the contents of the packages.  What he did not realize
was the nature or essence of the activity.

Late in 2007, Alex asked Peter to do him a "favor."  On this occasion, Alex had
purchased items directly from someone identified as "Sean," and he wanted Peter to
meet Sean, take delivery of the items, and send them to him.  Much to Peter's surprise
and dismay, these items looked much more serious than the "binoculars" and
"batteries" he usually forwarded to Alex.  This time, he saw what appeared to be a
military jet fighter pilot helmet.  Peter now realized that he had become involved in
something much more sinister than simply trying to save a few dollars on an export

---

[1]Just before his arrest, Peter met with an undercover in order to take delivery of items that
Alex had purchased directly from the undercover.  During these meetings, Peter for the first time
learned about the requirement of an export license for these type of items.

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page seven

tax, or avoiding the red-tape of inspections.   After that transaction, Peter notified
Alex that he didn't want to be involved in this anymore.  Shortly thereafter, Peter was
arrested.

### (2) The Heartland of § 2M5.2:

In order to demonstrate that Peter Liu's conduct falls well outside the heartland
of § 2M5.2, it is necessary to review of the conduct of offenders in typical cases
punished by the section.  Such an analysis leads to the inescapable conclusion that
Peter Liu's conduct is atypical and non-representative of individuals generally
punished for this activity.  His conduct should be distinguished from the conduct
contemplated by § 2M5.2; indeed, it falls outside of the heartland.

Cases which illustrate the typical application of § 2M5.2 include U.S. v. Sero,
520 F3d. 187 (2d Cir. 2008).  There, a defendant acting on his own obtained and
shipped obvious gun parts and ammunition, including take-down pins, trigger
housing units, a bolt group, a sighting group, a stock, 7.62 mm magazines, two boxes
of .40 caliber  cartridges, and 3 boxes of weapons primer.   Sero alone devised the
scheme and profited from his conduct. See also U.S. v. Hendon, 43 F.3d 24, (2d Cir.
1994), involving a defendant who, in a reverse sting, believed he was selling AK-47s
to  representatives of the Republic of Iraq, and  intentionally misrepresented the
destination on the customs label as the Philippines, instead of Iraq.  In U.S.v. Castro-
Trevino, 464 F.3d 5th Cir. 2006), a defendant was observed by federal agents
purchasing large quantities of ammunition in Brownsville, Texas, and later observed
attempting to take it to the Republic of Mexico.   After his arrest, the defendant
admitted that he entered the United States solely to purchase the ammunition and that
he knew that it was illegal to export ammunition without a license.

### (3)  Peter Liu's Conduct is Outside the Heartland:

In the instant offense, it was never Peter Liu's intent to make enormous profits
by knowingly exporting weapons, ammunition and obvious military hardware without
the necessary license.  Indeed, until meeting with the federal undercover agent, Peter
never even knew a license was required to ship items purchased by Alex.  In reality,

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page eight


Peter was a gullible young man who believed he could make a little extra money and provide a service for fellow Taiwanese by helping them bid for items on eBay. None of the items in question were selected by Peter. While he knew that they weren't really the 'toys' and 'batteries' he described on the customs labels, he never suspected that one could even purchase high-tech weaponry on the internet, let alone, on eBay. He thought that by mis-labeling his shipments, he was helping to avoid higher taxes, red-tape, delays and inspections. While there is no dispute that Peter's conduct was knowing and willful and sufficient to make him guilty, it is nevertheless also clear that, to a large extent, Peter neither knew nor understood the nature or magnitude of what Alex was doing. The fact that he earned approximately $2,000 for his efforts corroborates that Alex not only used Peter, but that Peter did not know or appreciate the extent of the criminal conduct involved.

Peter Liu's role was to permit Alex to "rent" his eBay account in order to place bids on items selected solely by Alex; take delivery of the items; misrepresent the description of an item and its true price (believing that the purpose was solely to avoid a higher tax or tariff); and then ship the item to Alex. His compensation for two years of providing Alex with this service was $2,000. When this conduct and motivation are compared with the conduct and motivation of other offenders punished pursuant to §2M5.2, there can be no doubt that Peter Liu's conduct and motivation fall well outside the guideline.

For the foregoing reasons, it is respectfully submitted that a downward departure based upon circumstances present to a degree not adequately taken into consideration by §2M5.2 is warranted here. Peter Liu's conduct, when measured against the conduct contemplated in §2M5.2, is outside the heartland of typical cases.

## II.  Application of the Sentencing Factors in  18 U.S.C. § 3553

Because the parties entered into the Plea Agreement herein post-Booker, the agreement recognizes that the parties may ask the court to consider a sentence outside of the stipulated Guidelines range on the basis of the sentencing factors set forth in 18 U.S.C. §3553(a) (Plea Agreement, p.3, par. 2). Here, based upon the

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page nine

individualized facts present in his case, Peter Liu respectfully requests that the court impose a sentence which is outside of the sentencing Guidelines.

Any doubt regarding the practical application of <u>Booker</u> upon sentencing has been largely resolved by <u>Gall v. United States</u>, 128 S.Ct. 586 (Dec. 10, 2007) and <u>Kimbrough v. United States</u>, 128 S.Ct. 558 (Dec. 10, 2007). Simply stated, a sentencing court may impose a sentence other than that recommended by the Guidelines if, in its discretion, it finds that the statutory regime of 18 U.S.C. § 3553(a) warrants such a sentence. The Supreme Court has determined that there is no specific requirement that the circumstances meriting a non-guideline sentence must be extraordinary; indeed, in its recent decision in <u>Gall</u>, the Supreme Court rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." 128 S.Ct. at 595. And as <u>Gall</u> makes clear, sentencing judges are no longer permitted even to presume that a Guidelines sentence is *per se* reasonable; rather, the court "must make an individualized assessment of the facts presented." <u>Id</u>. at 596-7. Indeed, it is impermissible to presume that a sentence outside the Guidelines range is unreasonable. <u>Id</u>. at 595.

Thus, when the Supreme Court held that the federal sentencing Guidelines were no longer mandatory, it restored to the sentencing court the ability to impose a sentence free of the mechanistic application of a sentencing scheme, which often prohibited the court from giving any consideration to many compelling, yet less than extraordinary, factors which are directly relevant to the type and length of sentence appropriate to impose upon an individual.

As this Court is well-aware, the legislative frame-work for the sentencing court to apply at the time of sentence is 18 U.S.C. § 3553(a). The legislative meaning of 18 U.S.C. § 3553 (a) is reflected in 18 U.S.C. § 3661, which states:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing a sentence.

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page ten

Ultimately, 18 U.S.C. § 3553(a) instructs the sentencing court to impose a sentence which is sufficient, but not greater than necessary, in order to comply with the purposes of sentencing as set forth in § 3553(a).

### A.  Peter Liu's history and characteristics and the circumstances of the offense warrant a non-guideline sentence, significantly below the advisory guideline range

It is respectfully submitted that a sentence significantly below the advisory guideline range of 37 – 46 months of imprisonment would be "sufficient but not greater than necessary, to comply with" the purposes and goals of 18 U.S.C. §3553(a).  In determining the reasonable sentence applicable to this case, it is first necessary to understand and consider the history and the personal characteristics of the defendant, Peter Liu, as well as the nature and circumstances surrounding his involvement in this offense.

(1)     *The personal history and characteristics of Peter Liu*

Peter Liu is a 27-year old defendant, whose slight frame, facial characteristics and demeanor make him appear much younger than he is.  Born in Taiwan as Kangai Liu, he took the name "Peter Liu" when he became a United States citizen in 2000 (PSR ¶¶42,45).   In 1995, the 15-year old Peter legally immigrated to this country, aspiring to obtain a better education and a chance for a better life.  Upon his arrival, Peter and his older brother Jack lived in Bayside, Queens, with their Aunt Nancy Chiu, who had sponsored the two brothers. (PSR ¶45)  Even though he spoke no English when  he first arrived in the United States, Peter quickly learned English and began to excel in school (PSR ¶62).  By his sophomore year in High School, the enterprising young Mr. Liu was earning spending money by working as a tutor in mathematics.  As a student, he also held jobs as an administrative assistant, hotel receptionist, and a box office sales associate and cashier at a local movie theater (PSR ¶68).   After earning his high school diploma, Peter attended and graduated from Queens College in 2005, with a bachelor of arts degree in economics (PSR ¶58).  While attending college full-time, Peter also had several part-time jobs, including as

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page eleven

a sales clerk at Bed, Bath and Beyond; as a secretary for a Pastor; as a computer repairman and installer for InfoServe, a computer store; and as a clerk for China Airlines (PSR ¶68).

While in college Peter met his fiancée, Lucy. She, along with his family and friends, have provided Peter with the emotional support he has needed to deal with the severe distress and depression that his involvement in this case has caused (PSR ¶¶ 48, 51, 52). Letters from Peter's family and friends accompany this submission as Exhibit B.

Since his graduation from college, Peter has been regularly employed:

•    From February to May 2006, Peter worked as a passenger services agent for Worldwide Flight Services, at JFK International airport (PSR ¶67)

•    From June 2006 to December 2007, Peter was employed as a flight attendant for Continental Airlines, at Newark International Airport.[2]

•    From March 2008 until the present, Peter has been employed as a bookkeeper at ESL Express, an import and export company located in Jamaica, New York.

Wracked with guilt and embarrassment as a result of the instant case, Peter sank into a significant depression following his arrest. So pronounced was his depression that Pretrial Services directed him to undergo out-patient mental health treatment. Peter, who has been diagnosed as suffering from an adjustment disorder and anxiety, is currently attending bi-monthly individual counseling sessions (PSR ¶55). While counseling has clearly helped Peter, it is likewise clear that Peter is still profoundly mortified for having been so foolish and having exercised such terrible judgment.

---

[2] It should be stressed that Mr. Liu did not use his position at Continental Airlines in any way whatsoever in order to commit any aspect of the charged offense.

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page twelve

Peter has acknowledged his guilt to his family and his fiancée Lucy. They have remained fiercely loyal and supportive, and as a result, it is clear that they have provided Peter with the strength he needs to face the consequences of his illegal conduct(PSR ¶52). Clearly, for someone like Peter Liu – who had always endeavored to comport himself according to the highest standards of behavior in his adopted country – to find himself arrested and convicted of a federal crime, has been a crushing experience indeed.

(2)    ***The nature and circumstances of Peter Liu's involvement in the offense.***

To understand how an earnest young man like Peter Liu could have become involved in a conspiracy to export military items on a highly-regulated Munitions List, it is necessary to know how the conspiracy began and to appreciate Peter's personality. As previously discussed, Peter simply set out to provide a service by "renting" his eBay account to Taiwanese people who wanted to shop on eBay, but who were prevented from doing so by eBay's policies. In so doing, he hoped to augment his income.

As previously discussed, Peter's downfall can clearly be traced to the moment when a customer who called himself "Alex" answered Peter's announcement. Alex, whom Peter has still never met in person, identified himself as a collector who wished to buy items on eBay. Unaware that an official "Munitions List" even existed, Peter never dreamed that items being offered for sale on eBay could possibly be the subject of national security scrutiny. In keeping with his over-achieving personality and his literal interpretation of events, Peter enthusiastically embraced this chance to recruit Alex as a customer. He scrambled to be as efficient and accommodating as possible, following Alex's instructions to the letter. Punctilious by nature, Peter kept detailed records of every transaction, payment and correspondence with all of his customers, including Alex.

At Alex's behest, Peter began to mislabel the customs labels on the items that he would send to Alex, for the purpose of "ease of transit." Alex assured him that by labeling shipments as "toys", for example, he could avoid cumbersome shipping

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page thirteen

delays. There is no dispute, however,  that Peter understood that such conduct must necessarily violate laws and regulations. Especially in light of his background in the airline industry, Peter understood that it was wrong and illegal to purposely mis-characterize the items he was shipping to Alex.  While Peter may not have known the exact nature of those items, or whether they could be considered weapons ( much less whether they were items requiring special government-issued licenses pursuant to the Munitions List), Peter clearly knew that whatever they were, they were neither 'toys' nor 'batteries', and that their value was much more than $30 or $40.

Nevertheless, it is also clear that Peter never grasped the full nature and scope of the conspiracy. He neither knew nor understood who and what "Alex" really was. For two years, Peter served as a glorified shipping and receiving agent for Alex's scheme; for his services, Peter earned the princely sum of $2,000, and brought shame and ruin to the life he was building in his adopted country.

The parties and the PSR agreed and stipulated that Peter merits a guidelines reduction as a minor participant.  And while it is true that Alex's scheme could never have worked without Peter's somewhat myopic assistance, it is nevertheless indisputable that Alex clearly took advantage of a gullible, unsophisticated young man in order to accomplish his goals.

## B.  Extraordinary Acceptance of Responsibility

Soon after his arrest, Peter Liu met with agents and the prosecutor in order to provide assistance to the Government.  Not only did he acknowledge his own conduct, but he also described the pattern of illegal activity that had taken place since late 2005, at least several months earlier than the time-frame previously known to the government.

There can be no doubt that Peter's efforts to cooperate were thorough  and sincere.  Not only did Peter provide a detailed explanation of his involvement with Alex since late 2005, he also provided the government with voluminous documents, including spreadsheets showing each transaction that he had engaged in with all of his 'customers,' including Alex.  Peter also provided the government with a detailed

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page fourteen

time line of his transactions with Alex; copies of all of his correspondence with Alex, including email and instant messages; and copies of all the financial transactions and payments involving Alex.

It is our understanding that the Government determined that Peter  had truthfully disclosed information about the illegal activity he had participated in and had witnessed.  Unfortunately, the government ultimately determined that  the information supplied by Peter was not needed in order successfully to prosecute Alex, who had already been charged and arrested, and was insufficient to permit the Government to prosecute any other individual.

The Second Circuit in U.S. v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006), has recognized that a sentencing court may consider a defendant's "particular efforts to cooperate and what those efforts showed about this defendant's 'history and characteristics,'" under 18 U.S.C. §3553(a)(1).   In other words, an attempt to cooperate, even if ultimately deemed a failed attempt by the government, may nevertheless be a §3553(a) factor for the sentencing court to consider in arriving at a  reasonable sentence.

Pursuant to §3553(a), recognition of a defendant's good-faith efforts to cooperate mirrors the favorable consideration accorded to "extraordinary acceptance of responsibility" under the strict guidelines regime.  For example, in U.S. v. Dickens, 926 F.2d 1323 (2nd Cir. 1991), the Second Circuit noted that a defendant who exhibits a higher degree of contrition than contemplated by § 3E1.1 "may, in an appropriate case, [receive] a downward departure." 926 F.2d at 1332.  See also U.S. v. Rogers, 972 F. 2nd 489, 491 (2nd Cir. 1992) (acceptance of responsibility, although taken into account in applying the adjustment under § 3E1.1, can even provide a basis for a departure when present to such a degree that it cannot be characterized as typical), and U.S. v. Lieberman, 971 F.2d 989, 996 (3d Cir. 1992).  In U.S. v. McGee, 802 F.Supp. 843 (E.D.N.Y.  1992), Judge Weinstein recognized that Dickens permitted him to consider "extraordinary acceptance"  as one factor warranting a downward departure when the defendant attempted to cooperate fully, but failed to complete a meeting with agents from the Netherlands.  More recently,  in U.S. v. Janusz, 986 F.Supp. 328 (D. Md. 1997) the sentencing court, citing Rogers,  found that the

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page fifteen

defendant had shown sincere remorse and demonstrated a degree of acceptance of responsibility substantially in excess of that ordinarily present. Accordingly, that defendant merited a downward departure. Perhaps the most thorough recent analysis of extraordinary acceptance of responsibility may be found in U.S. v. Nguyen, 212 F. Supp.2d 1008 (N.D. Iowa 2002). After determining that the Sentencing Commission has never prohibited this as a grounds for downward departure, the Court in Nguyen noted that "[e]xtraordinary acceptance of responsibility is not among the listed [discouraged or forbidden] factors, allowing a conclusion the guidelines do not explicitly discourage departure on this basis." 212 F.Supp.2d at 1020, quoting U.S. v. Stewart, 154 F.Supp. 2d 1336, 1343 (E.D. Tenn. 2001). Continuing, the Court observed:

> "'[E]ven though the Commission has not explicitly enumerated extraordinary acceptance of responsibility as a favored basis for departure, it has indicated a departure may be appropriate where a defendant's assistance in the investigation and prosecution of his or her offense rises to a level beyond what one ordinarily sees in a standard case.'"

212 F. Supp. 2d at 1021, quoting Stewart, 154 F.Supp. 2d at 1342. Thus, based upon its review, the Court concluded that extraordinary acceptance of responsibility is, at the very least, an acceptable factor to which a Court may accord positive weight in fashioning the appropriate sentence.

### C.  The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, provide just punishment and promote deterrence.

As previously discussed, Peter Liu is currently facing a basic range of 37 - 46 months' incarceration pursuant to the advisory sentencing Guidelines. Further, we have attempted to illustrate that, because Peter Liu's conduct varies significantly from the behavior that §2M5.2 was designed to punish, his case falls outside of the "heartland," and the correct Guidelines range would therefore incorporate a significant downward departure pursuant to U.S.S.G. §5K2.0.

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page sixteen

While we recognize that Peter must face consequences for his conduct, it is respectfully submitted that any sentence of imprisonment would be far more harsh and disruptive than necessary to achieve the goals of sentencing. Indeed, such a sentence would completely ignore Peter's exemplary history prior to his naive involvement with Alex, and unnecessarily derail his noteworthy efforts to turn his life around since his arrest.

In light of the factors and circumstances discussed herein, it is respectfully submitted that the reasonable sentence would be Probation, in combination with a period of home-detention and a curfew designed to permit him to continue his full-time employment.

A sentence of Probation would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for Peter Liu's conduct, while recognizing the particular circumstances of his role and conduct in the conspiracy, and his extraordinary efforts to cooperate with the Government. Such a sentence would truly recognize Peter's individual history, a history which strongly suggests that there can be no realistic need to further protect the public from any further crimes. Indeed, it is not hyperbole to suggest that it is difficult to imagine that Peter Liu will ever participate in criminal activity again. This is not a young man who needs to turn his life around and seek rehabilitation; rather, this is a young man who needs to return to the productive and stable life that he has always tried to lead. As the Supreme Court observed when considering the sentence imposed on Brian Gall (Gall v. U.S., 128 S.Ct. 587 (2007):

> At the end of both the sentencing hearing and the sentencing memorandum, the District Judge reminded Gall that probation, rather than "an act of leniency," is a substantial restriction of freedom." . . .
>
> "[Gall] will have to comply with strict reporting conditions along with a three-year regime of alcohol and drug testing. He will not be able to change or make decisions about significant circumstances in his life, such as where to live

Honorable Robert P. Patterson, U.S.D.J.

July 8, 2008

Page seventeen

> or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court. Of course, the Defendant always faces the harsh consequences that await if he violates the conditions of his probationary term."

> Finally, the District Judge explained why he had concluded that the sentence of probation reflected the seriousness of Gall's offense and that no term of imprisonment was necessary:

> "Any term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who, the Court has found, understands the consequences of his criminal conduct and is doing everything in his power to forge a new life. The Defendant's post-offense conduct indicates neither that he will return to criminal behavior nor that the Defendant is a danger to society. In fact, the Defendant's post-offense conduct was not motivated by a desire to please the Court or any other governmental agency, but was the pre-Indictment product of the Defendant's own desire to lead a better life."

> Gall, 128 S.Ct. at 593 (internal quotations omitted).

Finally, taken together with the sobering consequences of having a felony conviction, the requirements of probation would afford adequate deterrence for others tempted to engage in such conduct.

Honorable Robert P. Patterson, U.S.D.J.
July 8, 2008
Page eighteen


## <u>CONCLUSION</u>

It is respectfully submitted that, in light of all of the factors of 18 U.S.C. §3553(a), a sentence significantly below the advisory guidelines range is warranted. For all of the reasons set forth above, it is respectfully requested that the court sentence Peter Liu to a term of probation.

In the event that the defendant Peter Liu is sentenced to a term of imprisonment, however, he respectfully requests that the Court recommend that he be designated to a correctional facility as close to New York City as possible, in order to enable his fiancee and other family members to visit with him while he is incarcerated. Your Honor's attention to and consideration of this submission are, as always, greatly appreciated.


Respectfully submitted,



Peter Enrique Quijano


cc:    A.U.S.A. William J. Stellmach (by ECF and email)
       U.S. Probation Officer Stephanie M. Dunne (by email)

# OBJECTION & COMMENTS
# TO THE
# PRESENTENCE REPORT

The defendant Peter Lui makes the following objections and comments to the PSR.

Pg2:   The defendant requests that the PSR reflect his current address as 175-02 65th Ave, 1st Floor, Fresh Meadows, New York 11365

¶9:    The defendant requests that the paragraph be amended to reflect that between 2006 and 2007, while working as a flight attendant, he flew primarily domestic and European routes.  During this time period, he flew to Asia a total of three times, once to Beijing and twice to Hong Kong.  In addition, none of his conduct in the offense involved or was related to his work with the airlines.

¶16:   The defendant objects to the paragraph and requests that it be amended to reflect that Mr. Liu had two eBay accounts.  After Mr. Liu became involved with Alex Peng, he permitted Peng to use one of his accounts.  It was solely Peng, using Mr. Liu's eBay account, who bid and purchased the items. Mr. Liu would receive the items and ship them to Peng.  Mr. Liu would pay for the items out his paypal accounts with funds deposited by Peng.

¶17:   The defendant requests that the paragraph be amended to correctly reflect that Peng purchased the helmet directly from the undercover agents, and that Peng asked Mr. Liu to accept delivery of the helmet and  forward it to Peng.

¶18:   The defendant requests that the paragraph be amended to correctly reflect that Mr. Lui inaccurately and falsely completed the Customs forms based upon specific instructions he'd receive from Peng in emails.

¶42:   The defendant requests that the paragraph be amended to reflect that both Mr. Liu's parents are currently residing in New York; and that his father suffers from hypertension and diabetes.

¶68:   The defendant objects to the conclusion that he was "fired because he 'could not meet the company standard' during the probationary period." Mr. Liu submits that when he was informed that he had not met the company standard during the probationary period, he was permitted to resign instead of being terminated.  Mr. Liu still maintains that he even if he had satisfactorily

completed the probationary period, he would have nonetheless left for the better position that he had secured.

¶71:  The defendant objects to the conclusion that he owns the 1995 Nissan Maxima. Mr. Liu's father purchased the car and it is registered in his name. Mr. Liu's father has given Mr. Liu use of the car in order that he can commute to work.

¶72:  The defendant requests that the following corrections and changes be made: As noted earlier the defendant has recently moved, and his paramour is no longer contributing to the monthly cash flow, accordingly, the additional $1,600 'Paramour's Net Salary' should be deleted; Mr. Liu's monthly rent is now $500; utilities are included in the rent, so that figure should be 0. In addition the defendant requests that the credit card figured be corrected to reflect approximately $1,317. See next paragraph.

¶73:  The defendant requests that the monthly credit card payment figure be corrected to reflect approximately $1,317; or in the alternative, that his monthly living expenses reflect a payment of $523 as a "loan payment." While Mr. Liu's monthly payment on **his** credit card account is approximately $794, Mr. Liu is also making the minimum monthly payments on his father's and brother's credit card accounts (approximately $523 monthly). Mr. Liu entered into this arrangement in order to pay his father and brother back for their loan of $30,000. Mr. Liu obtained this loan in order to pay his legal expenses.

Honorable Robert P. Patterson
United States District Judge
United States District Court
for the Southern District of New York
500 Pearl Street
New York, New York 10007

July 1, 2008

Dear Judge Patterson

I am writing this letter to request that you exercise leniency in the case of Peter Liu
(kang-Tai Liu). Peter is my nephew and I have know him for 17 years ever since I
became a member of his family. Peter is one of the most selfless people I know. If
anyone needs any help, you can call Peter and if he could he would. He is a loving
member of the family and I have spent many holidays and family dinners with
Peter and he is a very pleasant person.

I know Peter is very sorry for what he has done and will not disappoint you if
given an opportunity to prove himself to you.

He is a very hard working individual and has always been an asset to the community.
He managed to put himself through college and he was beginning a new career in the
airline industry.

Peter accepts full responsibility for his actions, and I know he has learned a lot from
this experience and will do whatever is in his power to prove to the court, his family
and friends, that he can make a positive contribution to the community.


Sincerely,

*Edward Pohlman*

Edward Pohlman

Honorable Robert P. Patterson
United States District Judge
United States District Court
for the Southern District of New York
500 Pearl Street
New York, New York  10007


June 15, 2008


Dear Judge Patterson:

We are writing this letter to ask for your leniency for our son Peter Liu. On December 2007, we have heard a very bad news, and that is our youngest son, Peter Liu, was arrested from US Police and was also custody for a day. We felt very sorrow for it. We can hardly believe and we have no idea what was really happen to our son. After we knew what happened from my sister, Peter had accidentally mailed items that require license. He was not aware those items could not mail outside USA. And he had made a huge mistake. After this lesson, his spirit had pounded deeply and he had lost his dream job. On top of that, he could not sleep well everyday because he needed to find out how to pay for his legal fee. We are as his parent, we did not know how to tell him. All we can do is to be with him and comfort him when he needs. We knew that he was very embarrassed for when he had done, and we also knew he has the heart to make up for his mistake. We believe US government is clear, and judge will give a first time make a mistake person a chance.

Peter is a very good kid who just graduate from college not too long ago. He still has very bright future in front of him. We knew after this matter, he would become a more mature and thoughtful person. Our son, Peter Liu, is very well-behaved kid. He does not let us worry. When he is outside with his friends, everyone knows him as a very smart youth. After what happen this time, he has learned very valuable lesson from it and he has courage to admit his mistake. Everyone who knows him give him a very big support. We also feel happy for him. Last, we are here please to ask you, Honorable judge Patterson, to show both compassion and leniency in your decision.  Thank you very much.


Sincerely,

FonTan Liu and YenMei LiuChiu

Honorable Robert P. Patterson
United States District Judge
United States District Court
for the Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Patterson:

My name is Ming Hung Hung and I am writing on behalf of my cousin Peter Liu. I have known him for more than 26 years and he has always been a conscientious, intelligent, and resourceful brother to me. After I moved to Virginia for my job at the United States Patent and Trademark Office about 9 months ago, we still keep in touch and share our thoughts even though we are far apart. I was shocked when I heard that he committed the crime for the first time because he made the wrong judgment. I have never seen him so remorse and ashamed in my life.

During these difficult months, he learned the consequences for making the wrong judgment. He lost his job as a flight attendant, and not able to support himself financially. In addition, he has to bear this "stain" with him for the rest of his life which would greatly impact his reputation and have a hard time in finding a job. Moreover, he acknowledged that his judgment had caused tremendous disappointments to his family, relatives, and friends who have been supporting him his entire life. Overall, he realized his life has changed significantly in just one moment simply because of making the wrong judgment.

Although Peter admitted that he was wrong, he is willing to accept the consequences and make the change. First, he promised his family, relatives, and friends that he will not make the same mistake again. Second, he plans to discourage others from making the same mistake by sharing his experience and let them know the seriousness if anyone is not making his/her judgment correctly. Lastly, he is going to volunteer at the local community to make up what he has done wrong for the society.

Even though Peter has promised us the change, he could not carry out what he has said unless he is given a chance. I ask for your compassion and leniency in your decision by giving him a mild sentence so he has a chance to prove himself. Thank you for your consideration.

Respectfully,
Ming Hung Hung

Honorable Robert P. Patterson
United States District Judge
United States District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

May 29th, 2008

Dear Judge Patterson,

I am writing this letter to ask for your leniency for my friend Peter Liu. I have known him for many years, ever since middle school. To everyone that's around him, he's a great friend; always caring, sincere, and willing to go the distance to please everyone. I was surprised and in shock when I found out he was charged with smuggling military equipments out of the United States. I never imagined he'd break the law, especially of these serious types, but what has happened happened and I can't change the fact in front of me. I have spoken with him after the incident on a few occasions, and I could tell from his expression and body language that he's sincerely ashamed of what he has done. He told me he was naïve and foolish, and did not put too much thought on the seriousness of this matter, had he known this beforehand none of this wouldn't have happened. He was just trying to make ends meet and unfortunately crossed the path with the wrong person.

This is a young man that had everything planned; the dream job that he wanted; the woman of his dreams; and the life that he hoped for. But one mishap turned his life into disarray. To this day whenever I talk to him, he is still full of regret, wishing he had not done the things that he did that got him to this place. Judge Patterson, before you is a young man that still has a bright future; a young man that does not approve of wrongdoing; a young man that is caring and loving to those that around him.

I plead with you for his leniency, for he is a young man that has a bright future ahead of him but carelessly broke the law without even knowing. He's dedicated person to everyone, especially those that are close to him. All he wanted to do was make his families' life better and nothing else. He's not the type of criminals portrayed on television, or any criminals of sorts. I plead with you; please do not take away a dedicated son, a caring boyfriend, and a great friend from us.

Sincerely

Bob C. Hsu

Honorable Robert P. Patterson
United States District Judge
United States District Court
for the Southern District of New York
500 Pearl Street
New York, New York  10007

June 9, 2008

Dear Judge Patterson,

Please consider this letter as a request to exercise discretion for leniency in the case of Peter Liu. I have known Peter for over 15 years, dating back when we were both in middle school. Throughout this time, I have never known Peter to be anything less then a responsible, considerate, truthful, and loyal friend. I've also had to opportunity to get to know his entire family living in Taiwan.

Over the past few months, Peter has acknowledged that he had made an error in judgment and action. He fully realizes that his actions not only affected himself but all of his family and friends. He has expressed to me on many occasions his remorse and recognizes that his involvement in this series of events has been a tremendous disgrace to his family. Peter has worked real hard in the pass few months trying to create some positive light on his situation and piecing back his life.

I ask that you are merciful and show leniency in Peter's case. Peter has accepted the responsibility for his actions and seeks the opportunity to serve his community in a positive manner. I truly believe that Peter has learned a lot from this incident and that he will do whatever is in his power to prove to the court, his family and friends, and the general public that he is an upstanding citizen and can positively contribute to his community.

Very Respectfully,

Tzu H. Chen
Lieutenant Junior Grade
United States Navy

Honorable Robert P. Patterson
United States District Judge
United States District Court
for the Southern District of New York
500 Pearl Street
New York, New York  10007


June 15, 2008


Dear Judge Patterson:

My name is Audrey Lee, and I am writing to you behalf of my friend, Peter Liu, who I
have known for almost 10 years. He was my high school classmate and we still keep in
touch after we graduated from high school.

When I heard about what happened, I was very shock. He has always been the kind of
person who works hard and never had trouble with the law before. Even though he was
not an A student, he always had good relationship with teachers and students. He never
questioned authority, but just been the best he could do.

I believe he has learned a lot from this event. From our conversation, I know that he is
very ashamed and embarrassed of what he did. He is hoping he can make up the mistake
he did. He now is more careful and thinks before he does anything.

Please kindly consider to give Peter a mild sentence. I would very appreciate your
compassion.


Sincerely,



Audrey Lee

Honorable Robert P. Patterson
United States District Judge
United States District Court
for the Southern District of New York
500 Pearl Street
New York, New York  10007

Dear judge Patterson,

Please consider this letter as a request to exercise discretion for leniency in case of
Peter Liu.  I first met Peter almost 5 years ago, thru my fiancé (my boyfriend back then).
Since then, I had many opportunities to get to know Peter through outings and family
gatherings.   Peter is a wonderful person, very responsible, always genuinely helpful to
others.  Easy going and down to earth, he's always warm to others, that's why everyone
liked Peter for his wonderful personalities.

When I first learned about this case, I was in shock like many others.  After listening to
Peter's confession, I was only wishing we can turn back time and give him another
chance.  He was in tears, felt nervous and remorseful, he was embarrassed to tell the
story and admitted that he has committed a crime, he thought he was just helping out,
only to realize he has over stepped the boundary.  He could not have been more
ashamed.  Friends and families have been supportive to help him through this tough
period.

Throughout this incident, Peter was devastated emotionally; he was extremely
concerned about his families, his friends, his girl friend, and also his job.  Peter have a
strong working ethic, and take his job seriously, he was afraid to lose his job, something
that he take pride in and love to do.  He felt sorry that he has put all the close ones,
friends and families, thru the hard times with him.

In conclusion, I have no doubt Peter has learned his lesson the hard way, he will mature
and grow from this mistake and realize the consequences with every decision.  Peter's
life will never be the same again; he will always be punished by his own self
consciousness.  I believe Peter will do whatever it takes to prove to everyone that he's a
good citizen and can positively contribute to the community.  I ask you, Honorable judge
Patterson, to show both compassion and leniency in your decision.  Thank you.

Sincerely yours,

Angelica Kennedy