

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 21, 2008

**BY HAND DELIVERY**

Honorable Robert P. Patterson, Jr.
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

       Re:    <u>United States v. Peter Liu</u>, S1 07 Cr. 1214 (RPP)

Dear Judge Patterson:

       The Government respectfully submits this letter in response to defendant Peter Liu's sentencing memorandum ("Def. Mem.").

       As described below, Liu's criminal conduct was serious and repeated, involving the submission of multiple false statements to United States Customs and Border Protection ("CBP") and the United States Postal Service regarding the contents of packages that he was shipping out of this country. The fact that those packages contained military hardware on the United States Munition List (the "Munitions List") merited the application of U.S.S.G. § 2M5.2, a national security Guideline, which as calculated by the United States Probation Office in the Presentence Investigation Report (the "PSR"), resulted in a Guidelines range of 37 to 46 months. The plea agreement pursuant to which the defendant pled contained a provision allowing him to move at sentencing for a downward departure, pursuant to U.S.S.G. § 5K2.0, based on the argument that his understanding of the offence conduct was such that his case falls outside the heartland of the conduct covered by U.S.S.G. § 2M5.2. The Government takes no position with respect to that motion.

       To the extent that Your Honor grants the downward departure motion (or the defendant's request for a non-Guidelines sentence), however, the Government submits that in seeking a probationary sentence the defendant ignores his repeated falsification of various customs declaration forms, and that he was, by his own admission, knowingly

smuggling items out of this country and attempting to avoid payment of applicable excise taxes and duties. Moreover, notwithstanding the defendant's claims about his ignorance of any restrictions on the export of the items he smuggled arising from the Munitions List, any sentence, pursuant to 18 U.S.C. § 3553(a), must recognize that this was not a garden variety fraud: the items that the defendant smuggled were not innocuous, but highly technical and militarily sensitive. In light of the defendant's serious and continued misconduct, the Government respectfully submits that an incarceratory sentence is appropriate.

## BACKGROUND

### A.    The Munitions List

The Arms Export Control Act ("AECA") regulates the export and import of defense articles and services and related technical data from and into the United States. The AECA authorizes the President of the United States to designate the items which are to be considered defense articles and services, to require licenses for the export of these articles and services, and to promulgate regulations for the import and export of these articles and services. The power to designate has been delegated to the State Department's Directorate of Defense Trade Controls ("DDTC"). The DDTC publishes its regulations as the International Traffic in Arms Regulations ("ITAR"). The ITAR contains a list of all items controlled by the DDTC, entitled the Munitions List. The Munitions List is a list of services, technologies, and articles designated as defense-related by the United States government.

No item contained on the Munitions List may be exported out of the United States without a license issued by the DDTC.

### B.    Liu's Criminal Conduct

Between at least March and December 2007, the defendant participated in a scheme to smuggle items on the Munitions List out of the United States. Using his eBay account, the defendant purchased certain items that were being auctioned on that web site at the direction of Alex Peng, his co-defendant, who resides in Taiwan.[1] In brief, Peng

---

[1]    The Government is in the process of extraditing Peng from Hong Kong, where he was arrested during a meeting with an undercover Homeland Security agent related to this investigation. Based on information developed during the investigation, the Government believes that Peng's business in Taiwan consists, in part, of reverse engineering military technology.

placed the bids using the defendant's account, and the seller then shipped the items to the defendant, who was the ostensible buyer. The defendant in turn then shipped these items to Peng.

To ship these items out of the United States, the defendant needed to complete various labels and forms, and to submit them for review to CBP and the Postal Service. In completing these forms, the defendant on at least four different occasions falsely represented the value and nature of the goods he was shipping. Specifically, the defendant falsely described the contents of packages as "toys" or "batteries," when in fact they contained clearly military or technical material. The chart below identifies the date of the shipment, the true contents of the package, the false description made by the defendant to CBP, the approximate value of the actual items, and the false value that the defendant reported:[2]

| Date of Export | True Items Shipped | False Description of Items Shipped | Approx. True Price of Items Shipped | Approx. False Price Claimed |
|---|---|---|---|---|
| Oct. 17, 2007 | One VITAL-2 infrared laser aiming device | Gift, Toys for Child | $1,720 | $36.95 |
| March 7, 2007 | Two AN/PEQ-2A infrared laser aiming devices | Toy Parts | $3,000 | $39.90 |
| Dec. 5, 2007 | One VITAL-2 and one ATILLA infrared laser aiming devices | Toy Parts | $3,400 | $39 |

As part of the Government's investigation, an undercover Homeland Security agent contacted Peng and purported to be a source of military hardware. Among other things, Peng discussed the purchase from the undercover of a Joint Helmet Mounted Cueing System fighter jet helmet and its associated technology.[3] After agreeing to the

---

[2]    Variable Intensity Tactical Aiming Lasers, Version 2 ("VITAL-2s"), ATILLA Tactical Aiming Lasers, and AN/PEQ-2As are weapons-mounted infrared laser aiming devices that project on a target an infrared laser beam that cannot be seen with the naked eye, but can be seen with night vision equipment.

[3]    The helmet is a fighter pilot's helmet and associated technology manufactured under contract with the Defense Department solely for military use. This helmet permits a fighter pilot to accurately direct (cue) onboard weapons against enemy targets while performing high-G aircraft maneuvers.

3

payment terms, Peng directed the undercover to contact the defendant, and the undercover subsequently arranged a meeting at a post office in Manhattan on December 6, 2007, so that the defendant could take possession of the fighter pilot helmet. During that meeting, the defendant inspected the helmet in its box, and the undercover specifically said that it was difficult to obtain the helmet and that he had a friend steal it; the undercover also stated that the Government specifically had to approve the export of the helmet. The defendant then stated that he realized that some of the items Peng had purchased in the United States were "not legal to send" outside of this country, and that he did not want to go to jail. Nevertheless, the defendant took possession of the helmet, which was found sitting on a table in his residence when he was arrested shortly after that meeting.

**B.    Procedural History**

On December 7, 2007, the defendant was arrested on a complaint. On December 20, 2007, a grand jury in this District returned Indictment 07 Cr. 1314 (RPP) against both the defendant and Peng. The Indictment charged the defendant in three counts. Count One charged the defendant with conspiracy to defraud the United States and to commit violations of the Arms Export Control Act, money laundering, smuggling, and receiving stolen U.S. government property in violation of 18 U.S.C. § 371. Count Five charged the defendant with unlicensed export of Munitions List items, in violation of 22 U.S.C. § 2778 and regulations promulgated thereunder. Count Fifteen charged the defendant with receipt of stolen government property, in violation of 18 U.S.C. §§ 641 & 21.

**C.    The Plea Proceeding**

On April 15, 2008, the defendant pled guilty before Your Honor pursuant to a plea agreement dated April 3, 2008 (the "Plea Agreement"), in which the defendant agreed to plead guilty to Superseding Information S1 07 Cr. 1314 (RPP), which charged him in five counts. Count One charged conspiracy to commit export smuggling, in violation of 18 U.S.C. § 371. Counts Two through Five each charged export smuggling, in violation of 18 U.S.C. § 554.

Among other things, the Plea Agreement contained a stipulation regarding the application of the Sentencing Guidelines to this case. Both parties agreed that U.S.S.G. § 2M5.2 applied, and that the appropriate Guidelines range was 37 to 46 months' imprisonment. (PSR ¶ 4). The specific calculations are also mirrored in the PSR. (PSR ¶¶ 27-38).

In addition, the Plea Agreement provided that: "The defendant reserves the right to move for a downward departure, pursuant to U.S.S.G. § 5K2.0, based solely on the argument that his understanding of the offence conduct was such that his case falls outside the heartland of the conduct covered by U.S.S.G. § 2M5.2." Plea Agreement, at 2. The Plea Agreement also provided that no other departures would be sought, while reserving each party's right to make any arguments relevant to the sentencing factors set forth in 18 U.S.C. § 3553(a).

## ARGUMENT

### An Incarceratory Sentence is Appropriate

As an initial matter, the Government takes no position on the defendant's motion for a downward departure. If Your Honor is inclined to grant such a departure, however, the Government submits that the probationary sentence that the defendant seeks is entirely inappropriate and ignores the actual smuggling conduct here, which was intentional, repeated, and at the very least fraudulent. Moreover, the items that the defendant smuggled (or conspired to smuggle, in the case of the fighter pilot helmet) to Taiwan were not innocuous merchandise, but materials of clearly technical and military value. Whatever the import of the defendant's claims about the heartland of the applicable national security Sentencing Guideline, it is undisputed that he was engaged in a scheme to defraud the United States by falsifying customs forms and other related documents, and that the scheme involved the illegal exportation of military hardware. In light of the seriousness of the defendant's criminal conduct, a probationary sentence is an insufficient deterrent and fails to recognize the gravity of the defendant's crimes.

### A.   Applicable Law

The Guidelines are no longer mandatory, but rather represent one factor a district court must consider in imposing a reasonable sentence in accordance with 18 U.S.C. § 3553(a). See United States v. Booker, 543 U.S. 220, 259-60 (2005); see also United States v. Crosby, 397 F.3d 103, 110-18 (2d Cir. 2005). In turn, Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations.

In Crosby, the Second Circuit explained that, in light of Booker, district courts must engage in a three-step sentencing procedure. First, the district court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a

Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." 397 F.3d at 112. Second, the district court should consider whether a departure from that Guidelines range is appropriate. Id. Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. Id. at 113.

Although the Sentencing Guidelines are no longer mandatory, the Second Circuit has instructed district judges to consider them "faithfully" when sentencing. Id. at 114. Indeed, the Circuit has held that the Guidelines range for a particular defendant is "a benchmark or a point of reference or departure" when considering a particular sentence to impose. United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir. 2005).

In the course of its opinion in United States v. Gall, 128 S. Ct. 586, 597 (2007), the Supreme Court briefly addressed the duties and the discretion of the district court at sentencing, and reiterated the procedure it had set forth in Rita v. United States, 127 S. Ct. 2456, 2465 (2007), which is consistent with the three-step procedure established in Crosby. Citing Rita, the Supreme Court in Gall explained that a district court should begin all proceedings by correctly calculating the applicable Guidelines range, which constitutes "the starting point and the initial benchmark." United States v. Gall, 128 S.Ct. at 596. Thereafter, the district court should consider the arguments of both parties as well as all of the Section 3553(a) factors. Id. In the process, the district court may not presume that a sentence within the Guidelines range is reasonable, and must make an individualized assessment based upon the particular facts of the case. Id. at 596-97. Finally, after determining an appropriate sentence, the district court must sufficiently explain the chosen sentence, including any variances from the Guidelines range, to allow for meaningful appellate review. Id. at 597.

In concluding in Rita that courts of appeals may apply a rebuttable presumption of reasonableness to sentences within the Guidelines range, the Supreme Court observed that the advisory Guidelines range reflects the considered judgment of the Sentencing Commission, after examining "tens of thousands of sentences and work[ing] with the help of many others in the law enforcement community over a long period of time" in an effort to fulfill the same objectives set out in Section 3553(a). Rita, 127 S. Ct. at 2464.

**B.      The Section 3553(a) Factors Warrant a Prison Sentence**

The defendant's criminal conduct was extensive and serious. For several months, he participated in the smuggling of stolen military hardware to a foreign country. The fact that he did not fully appreciate the military significance of certain items (at least, presumably, until he was handed the fighter pilot helmet in his meeting with the undercover) in no way obviates the fact that the defendant repeatedly and intentionally falsified customs declaration forms and other mailing documents to conceal the true nature and true value of the items he was exporting to Taiwan. Regardless of whether his conduct falls within the heartland of U.S.S.G. § 2M5.2, the defendant fully appreciated that he was engaged in smuggling and that he intended to defraud the United States out of the appropriate excise taxes and duties.

> 1.      **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The application of the sentencing factors in Section 3553(a) in no way alters that calculus. There is nothing remarkable about this defendant's background or characteristics that would merit a probationary sentence. As explained above, the criminal conduct here was extensive and the defendant's role was significant. Moreover, this crime was committed entirely from greed: no substance abuse or financial crisis precipitated this criminal conduct. Simply put, the defendant decided to use his eBay account to increase his income, and realized that he could earn thousands of dollars from Peng by making repeated misrepresentations in customs declaration forms and labels. At best, the defendant, in connection with at least four different deliveries to Peng, falsely represented the contents of the packages to CBP and the Postal Service.

Moreover, while the defendant may not have appreciated that the items Peng purchased were Munitions List hardware, the actual nature of the goods smuggled here should inform this Court's sentence when it considers the nature and circumstances of the offense, pursuant to 18 U.S.C. § 3553(a)(1). Indeed, the defendant's other clients through his eBay business purchased "stereo equipment, sporting goods, and clothing." Def. Mem., 5. The goods that the defendant shipped to Peng were clearly of a different caliber, and, in the case of the fighter pilot helmet that the defendant accepted from the undercover, military in nature.

> 2.      **Need for Deterrence and to Promote Respect for the Law**

The defendant's conduct was not aberrant. As explained above, the defendant engaged in repeated false statements on numerous occasions. A probationary

sentence amounts to a slap on the wrist for a fraudulent scheme that depended entirely on this defendant's participation.

The defendant analogizes his background and offense conduct to Brian Gall, who received a probationary sentence that the Supreme Court affirmed. See Def. Mem., 16-17. That reliance is misplaced. Gall distributed the controlled substance "ecstasy" while in college, but withdrew from the conspiracy after seven months, sold no illegal drugs subsequently, and had worked steadily following his college graduation. See Gall, 128 S.Ct. at 589. By contrast, the defendant here was fully adult, not a young college student, and the crime here involved smuggling items with national security implications. Moreover, while the defendant claims that he quit working with Peng shortly before he was arrested, there is nothing to corroborate those claims. Indeed, the day before his arrest, the defendant met with the undercover agent who delivered the fighter pilot helmet that Peng had purchased. In that meeting, the undercover explicitly informed the defendant that the helmet was stolen and being exported illegally, but the defendant nevertheless accepted it—a fact that standing alone speaks to a need for specific deterrence in this case.

Finally, there is also a need for general deterrence and to promote respect for the law. This scheme went far beyond the mere undervaluing of innocuous items which deprived the United States of excise taxes. While the defendant may not have appreciated the restrictions on export or the implications of the Munitions List, he certainly was aware that the items he shipped to Taiwan were sensitive in nature, and, in the case of the fighter pilot helmet he accepted on his co-conspirator's behalf, of military value. This was not some garden variety fraud, and the Government submits that only a term of imprisonment would therefore be proper.

### 3. The Fraud Guideline

The defendant moves for a downward departure on the grounds that his understanding of the offence conduct was such that his case falls outside the heartland of the conduct covered by U.S.S.G. § 2M5.2. As mentioned above, even if the defendant did not fully understand the nature of the Munitions List items that he was smuggling out of the United States, he certainly knew that he was engaged in fraudulent activity.

If Your Honor does depart downwardly, then the Government suggests that the Guidelines supply one alternative method for fashioning an appropriate sentence in this case. If the items at issue here had not been on the Munitions List, then U.S.S.G. § 2B1.1, the fraud Guideline, would have applied. See U.S.S.G., Appendix A. Accordingly, U.S.S.G. § 2B1.1 may provide an analog for an appropriate sentence.

Under that Guideline, the defendant would face a sentence in the range of 0 to 6 months' imprisonment.[4]

## CONCLUSION

In sum, the nature and circumstances of the defendant's criminal conduct, and other factors set forth in Section 3553(a), weigh heavily in favor of an incarceratory sentence. Accordingly, the Government respectfully submits that the defendant's criminal conduct merits a prison sentence, and that, to the extent Your Honor departs downwardly, the fraud Guideline suggests one alternative sentence.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By: _William J. Stellmach_
William J. Stellmach
Assistant United States Attorney
(212) 637-2101

cc:   Peter Enrique Quijano, Esq.

---

[4]  Pursuant to U.S.S.G. § 2B1.1(a)(2), the base offense level would be six. Pursuant to U.S.S.G. § 2B1.1(b)(1)(B), the offense level would be increased by two levels because the defendant's gain from the crime was more than $5,000 but less than $10,000. Pursuant to U.S.S.G. § 2B1.1(b)(9)(B), the offense level would be further increased by two levels because a substantial part of the fraudulent scheme was committed from outside the United States. Allowing a two-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), results in a total offense level of 8, which, with a Criminal History Category of I, yields a Guidelines range of 0 to 6 months.